**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

No. 21-2402

───────────

DEBORAH FRANKLIN, as Administrator of the Estate of Danquirs Franklin,

Plaintiff - Appellant,

v.

CITY OF CHARLOTTE; WENDE KERL,

Defendants - Appellees.

───────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:20-cv-00330-GCM)

───────────

Argued: December 6, 2022                    Decided: April 4, 2023

───────────

Before GREGORY, Chief Judge, WILKINSON, Circuit Judge, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

───────────

Affirmed in part, vacated in part, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Gibney joined. Judge Wilkinson wrote a concurring opinion.

───────────

**ARGUED:** S. Luke Largess, TIN FULTON WALKER & OWEN, Charlotte, North Carolina, for Appellant. Lori R. Keeton, LAW OFFICES OF LORI KEETON, Charlotte, North Carolina; Roger A. McCalman, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Clarence E. Matherson, Jr., OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee City of Charlotte

───────────

GREGORY, Chief Judge:

The Constitution tolerates the use of deadly force by police officers only when necessary to thwart an imminent threat to life, which requires the officer to reasonably perceive danger. The dividing line between reasonable and unreasonable justifications for claiming a human life, though notoriously elusive, must be meticulously sketched and jealously preserved. When an officer issues a clear command to an armed suspect to do one thing and that person does another, we seldom question the officer's use of force. But when the officer's abstruse commands require the suspect to divine their meaning, the law cannot be so forgiving. In those circumstances, courts are duty-bound to engage in a searching examination of an officer's resort to deadly violence. Today, we deal with such a case.

When Charlotte-Mecklenburg Police Department ("CMPD") officers Wende Kerl and Larry Deal responded to a disturbance at a Charlotte fast-food restaurant, Officer Kerl expected to confront a gun-wielding man threatening the public. Instead, she encountered Danquirs Franklin, crouching quietly and disturbing no one. Even before Officer Kerl could see Franklin, she barked orders to see his hands. Once Franklin was in her line of vision, Officer Kerl could see neither his hands nor a firearm. Even so, for forty-three seconds the officers shouted unremittent commands to drop a weapon no one could see. As Franklin retrieved a firearm from inside his jacket and it fell to the ground, Officer Kerl shot Franklin twice. In a blink, Franklin was dead.

On behalf of his estate, Franklin's mother ("Mrs. Franklin") brought claims under 42 U.S.C. § 1983 and North Carolina law against Officer Kerl and the City of Charlotte ("City") in federal district court. The district court granted summary judgment for both

2

defendants after concluding that Officer Kerl was entitled to qualified immunity and the City was not responsible for Officer Kerl's conduct under federal or state law. Mrs. Franklin appealed both aspects of the district court's decision. Although we agree that the City is not liable under § 1983 or North Carolina law for negligent training, we hold that Officer Kerl acted unreasonably and is not entitled to qualified immunity. Accordingly, we remand Mrs. Franklin's federal claim against Officer Kerl, and her remaining state claims against both defendants, for trial resolution.

## I.

This case arises from the district court's order granting summary judgment for Officer Kerl and the City. In reviewing that decision, we "take the facts in the light most favorable to [Mrs. Franklin] to determine the applicable questions of law and ignore any contrary factual claims," even if "a jury could well believe the evidence forecast by the [Defendants]." *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017).

## A.

Just after 9:00 a.m. on March 25, 2019, police dispatchers received two 911 calls reporting an unfolding incident at a Burger King in Charlotte, North Carolina. Both callers described a man, later identified as Danquirs Franklin, who was threatening patrons and staff with a firearm. Officers Kerl and Deal responded to the call. Before they arrived, Franklin exited the restaurant and crouched down next to the passenger side of a Honda sedan parked in the restaurant parking lot. Officer Kerl's department-issued body camera captured the following events.

3

Officer Deal arrived first, parking his patrol cruiser at an angle behind the Honda's left bumper. Officer Kerl angled her vehicle behind Officer Deal's. Both officers exited their vehicles, weapons drawn. Immediately, each officer shouted, "Let me see your hands," and "Let me see your hands, now!"—a total of four commands. Officer Deal stood behind the open driver-side door of his cruiser, pointing his firearm at Franklin. From her initial position behind her own cruiser, Officer Kerl could only see the driver side of the Honda. She could not see Franklin.

Officer Kerl moved to get a better view. Abandoning the cover of her cruiser, she ran in front of Officer Deal's drawn weapon, telling him: "I'm crossing, I'm crossing." She moved to the passenger side of the Honda, stopping in front of Franklin. She was now standing adjacent to the rear taillight on the passenger side of the Honda. Franklin was crouching directly in front of her, but facing the open passenger side of the Honda with his left shoulder in full view of the officers. He was on the balls of his feet, about one foot away from the Honda's male passenger.[1] Franklin's hands appeared to be clasped together between his legs. Officer Deal moved up to cover Officer Kerl, advancing from his car door until he was behind the trunk of the Honda.

Once Officer Kerl established her new position, both officers changed their commands to variants of "Drop the gun!" As the officers issued commands, a woman in a

---

[1] Another CMPD officer monitoring cameras in a Real-Time Crime Center showed Franklin exit the Burger King and advised officers Kerl and Officer Deal of Franklin's position as they were en route. The Burger King general manager, Timothy Grier, was sitting no more than a foot away from Franklin in the passenger seat of the car calming him down as he crouched to face Grier. Grier reported that, as police arrived, Franklin clasped his hands to pray with him. Grier did not see a gun in Franklin's hands.

4

Burger King uniform walked up to Franklin but behind the open Honda passenger-side door. The officers ceased their barrage of commands at Franklin only to yell at her to get back: "Ma'am, get out of the way!" After the restaurant employee complied, the officers resumed their shouting at Franklin: "Drop the gun!" "Drop it!" "Drop the weapon!" "I said drop it!" "Put it on the Ground!" Although neither officer remembers hearing it, the body camera audio picks up Franklin's response: "I heard you the first time." The officers continued to yell.

Throughout the encounter, Franklin's demeanor appeared passive. For most of the video footage, Franklin's head is obscured by Officer Kerl's hands clasped around her service weapon. But, at times, the video shows Franklin move his head. When Officer Kerl assumed a position facing Franklin directly, his eyes were fixed upon the ground. When the Burger King employee approached, Franklin briefly turned his head in her direction before looking forward at the passenger of the Honda. Franklin also turned his head slightly in Officer Deal's direction twice.

As the officers barked instructions to drop his weapon, Franklin's body stayed still. Finally, without moving his head or legs, Franklin slowly reached into the right side of his jacket and retrieved a black handgun with his right hand. When Franklin's gun was in Officer Kerl's view, her body camera shows that it was not in a firing grip; Franklin held it by the top of the barrel slide with the grip-side closest to the officers and the muzzle pointed away from them. Immediately, Officer Kerl discharged her weapon twice, striking Franklin in the left arm and abdomen. As he slumped against the open car door, Franklin

5

looked in the officers' direction with a face of shock and uttered his final words: "You told me to."

An ambulance took Franklin to the hospital, where he was officially pronounced dead less than an hour later. All told, forty-three seconds elapsed between Officer Kerl's arrival on the scene and when she fatally shot Franklin. In that time, the officers had shouted twenty-six commands—variations of "let me see your hands" four times, and of "drop the weapon" twenty-two times in a row.

## B.

Shortly thereafter, CMPD conducted an internal investigation, interviewing the officers and several witnesses at the scene. In their interviews, both officers Kerl and Deal told investigators stories that contradicted the video evidence. For example, Officer Deal recounted that he and Officer Kerl gave, and Franklin ignored, repeated commands to show his hands and indicated that Franklin brandished a gun pointed in their direction. During her interview, Officer Kerl told investigators that Franklin ignored her commands, retrieved the gun and turned toward her just before she shot him.

In addition to the internal CMPD investigation, an independent Shooting Review Board ("SRB"), comprised of senior members of the CMPD, investigated the incident.

When the SRB interviewed Officer Deal, he explained that he did not perceive a lethal threat when he first arrived on the scene despite immediately drawing his service weapon. At first, he "wanted to . . . assess it and . . . see what was going on." J.A. 840. Officer Deal said he was surprised when Officer Kerl crossed in front of him, which he admitted could have "tactically put [them] in a disadvantage." J.A. 843. He also acknowledged that

6

Officer Kerl's chosen position "wouldn't have necessarily been [his] approach," J.A. 844, and that "we both could have done a better job at [communicating]," J.A. 845.

Asked what he expected Franklin to do in response to the instructions to drop the gun, Officer Deal conveyed that he wanted some communication that Franklin intended to comply. He then agreed that if the gun was in Franklin's waistband or jacket, it would be reasonable for him to reach for the gun after the officers commanded him to drop it, but Officer Deal wouldn't expect the gun to be pointed at him when it came out. Officer Deal told the SRB that he was surprised by Officer Kerl's decision to shoot Franklin because he would have handled things differently, but then, contradicting that statement, claimed that "given the circumstances . . . [he] would have taken that shot." J.A. 849. Officer Deal also agreed that he had been trained to give different commands: He was taught to tell Franklin "[t]o raise his hands and walk backwards towards [the officers] . . . . to get him closer to [the officers], where there could be cover taken[.]" J.A. 853.

When questioned by the SRB, Officer Kerl stood by her choice to stake out a vulnerable position and give the commands that she did. She recalled that Franklin had a blank stare and did not communicate, which she felt would render alternative commands useless. Like Officer Deal mentioned, and as she stated in her interview with CMPD investigators, Officer Kerl said she expected Franklin to communicate his intention to comply with her commands. Because she did not hear Franklin attempt any communication, Officer Kerl stated that she felt his movement toward his jacket was a threat. In her words: "I don't know what he was going to do." J.A. 864. "I can't wait for

him to pull it all the way out to who's it pointed at . . . . I had to worry about the people that were around me." J.A. 861.

In her mind, Officer Kerl had no opportunity for "any de-escalation." J.A. 863. Nor did it occur to her that Franklin's actions were an attempt to comply with her commands to drop his gun. According to Officer Kerl, "he shouldn't be reaching for anything when an officer is there" without first conveying his intentions. J.A. 869. Officer Kerl also recalled the positioning of the gun differently than in her initial recollection to CMPD investigators. Officer Kerl described to CMPD investigators that Franklin retrieved a gun from his jacket with his left hand and turned it toward her and Officer Deal as if to shoot. She told the SRB that she did not know if the gun was pointed in her direction because "all [she] saw was the butt of the gun." J.A. 870. Still, she stated that she perceived a threat given the nature of the 911 call and the number of bystanders in the vicinity.

Ultimately, the SRB declared the shooting justified. As Chief of Police Johnny Jennings testified by deposition, the SRB's role is to assess if training and policies were followed. The SRB concluded that Officer Kerl's sole violation was the improper use of her bulletproof vest. Even while finding the shooting justified and no other rules violated, the SRB required Officer Kerl to be retrained in the police basics of keeping cover. Officer Kerl was also removed from patrol following the SRB hearing.

Franklin's family appealed the SRB's decision to a Citizens Review Board ("CRB"), a remedy made available by a City ordinance. The CRB found that the SRB and police chief "clearly erred in finding the use of deadly force here was justified under Department policy and applicable law." J.A. 877. The CRB's determination was based

8

mainly on the discrepancies between the video evidence and Officer Kerl's stated recollection to CMPD investigators. The CRB also noted that the situation had been de-escalated significantly when the officers arrived, and nothing on the scene before Franklin dropped the gun suggested that he endangered the officers or bystanders.

Under the CRB ordinance, the City Manager has the authority to resolve conflicting conclusions between the SRB and CRB. The City Manager affirmed the SRB's assertion that the shooting was justified and consistent with the City's use of force policy. Yet partly in response to the Franklin shooting, the City added a "duty to intervene" to the CMPD Rules of Conduct, which requires a CMPD officer to intervene when witnessing another officer mishandle a citizen encounter. J.A. 512.

C.

Acting as the administrator of Franklin's estate, Mrs. Franklin sued Officer Kerl and the City in the United States District Court for the Western District of North Carolina, raising two types of claims. First, she argued that, under 42 U.S.C. § 1983, Officer Kerl violated Franklin's Fourth Amendment right to be free from excessive force and the City was subject to municipal liability for that violation because its policymakers found the shooting justified. Second, Mrs. Franklin brought claims under state tort law alleging that Officer Kerl is liable for assault and battery, that the City negligently trained Officer Kerl, and that both are liable for the wrongful death of her son. Officer Kerl and the City moved for summary judgment, while Mrs. Franklin cross-moved for partial summary judgment.

As to the Fourth Amendment claim, the district court first considered Officer Kerl's entitlement to qualified immunity. Concluding that Officer Kerl likely shot Franklin by

9

mistake, the court identified the relevant question as "whether Officer Kerl's mistake in shooting Franklin was reasonable." J.A. 1138. To answer that question, the court considered the officers' knowledge that Franklin possessed a gun, Franklin's general unresponsiveness, and his detached demeanor. In view of those circumstances, the court found reasonable Officer Kerl's perception that Franklin's decision to reach for the gun posed an imminent lethal threat. For the same reasons, it determined Officer Kerl's decision to shoot Franklin was not excessive under the Fourth Amendment.

Because it found no constitutional violation, the district court rejected Mrs. Franklin's argument that the City Manager's decision not to overturn the SRB's finding of a justified shooting constituted a "ratification" of an unconstitutional action. J.A. 1142. Additionally, even had it found Officer Kerl's actions unconstitutional, it determined that "the City Manager's post-facto approval of an internal shooting investigation cannot possibly have caused the constitutional violation." J.A. 1143.

As to the state tort claims for wrongful death against the defendants and assault and battery against Officer Kerl, the district court held that "[b]ecause Officer Kerl's use of deadly force was reasonable . . . it also complied with state law." J.A. 1144. The court then analyzed the negligent training claim under North Carolina's negligent hiring and supervision standard, finding no evidence of "inherent unfitness or previous specific acts of negligence" or "evidence that the City of Charlotte had any actual or constructive notice" of Officer Kerl's incompetence. J.A. 1145.

10

Accordingly, the district court denied Mrs. Franklin's motion for partial summary judgment and granted Officer Kerl and the City's motion for summary judgment, dismissing the case. Mrs. Franklin appealed that decision.

## II.

### A.

On appeal, Mrs. Franklin asks this Court to reverse every aspect of the district court's grant of summary judgment for the defendants. First, Mrs. Franklin maintains that Officer Kerl is not entitled to qualified immunity because, while Franklin possessed a gun, Officer Kerl's belief that he posed an imminent threat was unreasonable under the circumstances. Next, Mrs. Franklin posits that the City Manager did not need to cause Officer Kerl's conduct for the City to be liable for her actions. Finally, Mrs. Franklin contends that the district court misapplied North Carolina law when it granted summary judgment for Officer Kerl and the City on her state-law claims.

### B.

This Court reviews de novo district court decisions on motions for summary judgment, qualified immunity, and state public official immunity. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018); *Hensley*, 876 F.3d at 579. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In our review, we must draw "all reasonable inferences" from those facts in Mrs. Franklin's favor. *Henry*, 652 F.3d at 531.

11

Likewise, in considering a defendant's entitlement to qualified immunity, we view the facts in the light most favorable to Mrs. Franklin. "[W]e may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendant['s] favor." *Hensley*, 876 F.3d at 579. For example, we may not take as true the officers' assertions that Franklin pointed his gun at them.

Finally, "to the extent this appeal requires us to decide questions of North Carolina law," we must "predict how the Supreme Court of North Carolina would rule on that issue." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citing *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) (internal quotation marks omitted)). We "respond conservatively when asked to discern governing principles of state law" and must "avoid interpreting that law in a manner that has not been approved by the Supreme Court of North Carolina." *Id.* (internal quotation marks omitted).

## III.

### A.

We begin our discussion with the district court's extension of qualified immunity to Officer Kerl. Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). In defense against a § 1983 claim, Officer Kerl is "entitled to invoke qualified immunity, which is . . . immunity from suit itself." *Id.*

12

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Under the well-known analysis of *Saucier v. Katz*, 533 U.S. 194 (2001), the Court must ask two questions: (1) "whether a constitutional violation occurred"; and (2) "whether the right violated was clearly established." *Henry*, 652 F.3d at 531. The Court may exercise its discretion in determining which of the two prongs to analyze first. *Pearson*, 555 U.S. at 236.

1.

Starting with the first prong of *Saucier*, we agree with Mrs. Franklin that Officer Kerl may have violated the Fourth Amendment. "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (internal quotation marks omitted)). Three factors, established by the Supreme Court in *Graham*, govern this analysis: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest." 490 U.S. at 396. When assessing these factors, the Court should focus on "the totality of the circumstances" based on the "information available to

the [officer] immediately prior to and at the very moment [she] fired the fatal shots." *Hensley*, 876 F.3d at 582 (internal quotation marks omitted).

In excessive force cases where an officer uses deadly force, the second *Graham* factor is particularly important. In these matters, the question comes down to whether the circumstances presented an immediate threat that justified the officer's resort to lethal force as objectively reasonable, "without regard to [the officer's] underlying intent or motivation." *Id.* at 582 (cleaned up). In other words, the Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper*, 735 F.3d at 159 (cleaned up).

Distilling general guiding principles from Fourth Circuit excessive force precedent is well-nigh impossible. There is nothing generic about the scenarios that lead a police officer to shoot another person. Still, we have drawn some lines. In a handful of decisions, we have found lethal use of force justified when "the objective basis for the threat was real, [even if] the gun was not." *Id.* By contrast, we have reached the opposite conclusion in cases where the gun "was real [but] the threat was not." *Id.*

When the Court has discerned an objective basis for lethal force, the case involved "a person in possession of, or suspected to be in possession of, a weapon" who does not "obey commands" and instead "makes some sort of furtive or other threatening movement with the weapon." *Knibbs*, 30 F.4th at 225 (collecting cases). Such defiance "signal[s] to the officer that the suspect intends to use [the weapon] in a way that imminently threatens the safety of the officer or another person." *Id.*

14

For instance, in *Anderson v. Russell*, we concluded that a Maryland police officer was justified in using deadly force when Anderson lowered his hands toward what the officer perceived to be a gun, defying the officer's verbal commands to keep his hands raised. 247 F.3d 125, 128–29, 130–32 (4th Cir. 2001). This Court found that the officer reasonably perceived that Anderson was armed based on a citizen's report that was later corroborated by the officer's own observation of a bulge near Anderson's waistband. *Id.* at 130. At first, Anderson complied with instructions to raise his hands, but the officer then saw him reaching toward the bulge, which prompted the officer to shoot him. *Id.* We held that the officer's "split-second decision to use deadly force against Anderson was reasonable in light of [the officer's] well-founded, though mistaken, belief that Anderson was reaching for a handgun." *Id.* at 132.

On the other hand, "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Cooper*, 735 F.3d at 159. As *Hensley v. Price* illustrates, there needs to be something more. *Hensley* involved a domestic disturbance during which the police witnessed Hensley strike his daughter with a gun. *See Hensley v. Shuttles*, 167 F. Supp. 3d 753, 759 (W.D.N.C. 2016). The summary judgment evidence showed that Hensley held the gun in his hand as he walked off his porch toward police deputies. *Hensley*, 876 F.3d at 578. The gun was pointed down at the ground when the deputies shot Hensley, and he "never raised the gun toward the Deputies or made any overt threats toward them." *Id.* Nor did the deputies order him to stop, drop the gun, or "issue[] any type of warning" before shooting him. *Id.* Under those circumstances, we held that the deputies were not protected by qualified immunity. *Id.* at 586.

15

In this case, the district court observed that in "hindsight, it seems likely that Officer Kerl made a mistake in shooting Danquirs Franklin" because he "appeared to be complying with the CMPD officers' orders to 'drop the gun' when he took the weapon out of his jacket pocket." J.A. 1138. But the question is whether her mistake was *reasonable*. Relying on the 911 reports that Franklin was armed, as well as his detached demeanor in the face of police instructions, the district court thought it was. In view of the body camera footage depicting the encounter, we cannot agree. A reasonable jury may not either.

Despite receiving 911 accounts of a man terrorizing people at a fast-food restaurant, the officers arrived at a very different scene than the one described in those reports. Franklin was no longer inside the restaurant, nor was he aggressive or outwardly threatening when Officer Kerl approached him. He also made no attempt to resist the officers or flee the area. One restaurant employee felt comfortable enough to walk up to Franklin during the confrontation before the officers ordered her to step back. Watching the events unfold, one cannot help noticing that the intensity of the situation emanated not from Franklin, but from the volume and vigor of the officer's commands.

Speaking of commands, the instructions the officers gave to Franklin to drop his weapon conflicted with their earlier orders and put Franklin in an awkward position. Although she first demanded to see Franklin's hands, Officer Kerl could not even see Franklin when she issued that command. She had no way of knowing if Franklin attempted to comply with that initial command because, by the time she could see him, she and her partner had abandoned that instruction in favor of one ordering Franklin to drop his weapon. But they could not see a gun either—they apparently assumed he had one in his hands, which were obscured between

16

his legs. Throughout the encounter, not much can be heard over the twenty-two orders to "drop the weapon." A close listen reveals that Franklin responded at one point by telling the officers, "I heard you the first time." Perhaps that response was not the acquiescence Officer Kerl was looking for, but the content of Franklin's response does not seem to matter. The officers were so boisterous that neither recalled hearing him say anything at all. And ultimately, Franklin did comply. We know now that Franklin's gun was concealed under his jacket, not in his hands. So, the only way for him to obey the officers' commands to drop the gun was to reach into his jacket to retrieve it. When he did just that, Officer Kerl interpreted his movement as a threatening maneuver.

That interpretation would be unreasonable if a jury finds that it rested on Franklin's "mere possession of a firearm." *See Cooper*, 735 F.3d at 159. Just as we observed in *Hensley*, Franklin "never raised the gun toward the [officers] or made any overt threats toward them." 876 F.3d at 578. Contrary to Officer Deal's recollection that Franklin pointed the gun at the officers and Officer Kerl's assertion that Franklin turned the gun toward them, the video footage shows Franklin facing toward the car and holding the gun in a non-firing grip, pointed away from everyone when Officer Kerl's shots rang out. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (noting that when record evidence, including a videotape, "blatantly contradict[s]" one party's version of the facts, the court may disregard that party's account). Focusing only on the "information available to [Officer Kerl] 'immediately prior to and at the very moment [she] fired the fatal shots,'" *Hensley*, 876 F.3d at 582 (citation omitted)—and observing the facts in the light most favorable to Mrs. Franklin—there was nothing furtive or menacing about Franklin's response to the officers' commands.

17

In her defense, Officer Kerl urges us to look beyond the seconds before she pulled the trigger and consider Franklin's general unresponsiveness to numerous commands. She emphasizes that Franklin's hands were hidden and he never showed them (despite the initial commands to do so). When Franklin moved unexpectedly toward his jacket rather than dropping the gun, which Officer Kerl believed was in his hands, Officer Kerl says she felt threatened.

Of course, our cases support Officer Kerl's position that if Franklin defied *clear* commands, then his actions may have provoked deadly force. In *Slattery v. Rizzo*, we concluded that a Virginia police officer was justified in using deadly force when a suspect in the passenger seat of a stopped car did not raise his hands and instead turned his body toward the officer, in violation of the officer's commands to raise his hands. 939 F.2d 213, 214–17 (4th Cir. 1991). Similarly, we held in *Elliott v. Leavitt* that an officer's use of deadly force was reasonable when a handcuffed suspect continued to point a handgun at the officer despite being ordered to drop his weapon. 99 F.3d 640, 642–43 (4th Cir. 1996). And in *Hensley* the officers acted unreasonably in part because they did not bother issuing any directives at all before shooting. 876 F.3d at 585.

The difficulty with Officer Kerl's argument, however, is that her commands simply were too ambiguous to transform Franklin's hesitation into recalcitrance. Police officers are trained to give various commands to achieve specific results precisely because one misjudgment could endanger the officers or the public. Here, after demanding to see Franklin's hands, the officers then pivoted to an inconsistent instruction, ordering him to drop his gun. Concededly, Franklin hesitated through twenty-some-odd commands as if "contemplating something." J.A. 172. Perhaps he was deciding how to drop a gun he was

18

not holding—or maybe he was just frightened by the torrent of shouting and gun-pointing. Regrettably, we will never know because Franklin is not here to explain himself.

We do know that Franklin did eventually drop the gun. When Franklin complied the only way he could—by taking the firearm out of his jacket to set it on the ground—it surprised Officer Kerl because she baldly assumed the weapon had to be in Franklin's hands from the start. But as Officer Kerl admits, she could not see Franklin's hands from her vantagepoint. It was unreasonable under these circumstances to assume that Franklin *must be* holding a weapon in his hands without leaving any daylight for the possibility that he was not. Acting on her unreasonable assumption, Officer Kerl's demand for Franklin to drop his weapon overlooked that possibility. Such a flawed view would make any movement or further handling of the weapon appear noncompliant and threatening. Yet, because it was elsewhere on Franklin's person, a foreseeable consequence of Officer Kerl's commands to drop the weapon is that he needed to retrieve it first before dropping it. A reasonable officer should understand the common-sense ramifications of her orders. *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) ("[W]e need not—and should not—assume that government officials are incapable of . . . exercising common sense.").

How Franklin handled the firearm once it was in plain sight matters too. Had Officer Kerl given Franklin a chance to surrender his weapon, she would have noticed what her body camera footage clearly shows: Franklin carefully pulled the firearm out of his jacket, pointed it at no one, and held it with just one hand from the top of the barrel. In other words, Franklin would have had to reposition his grip to become a threat—likely by using his free hand to shift the weapon into a firing position. Viewing the non-threatening

19

way Franklin handled the weapon once he retrieved it, a jury may conclude that this was not a menacing act, but mere compliance with orders. *See, e.g.*, *Est. of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 669 (4th Cir. 2020) (concluding that a man who carried a knife up his sleeve was not a threat because he was physically unable "to wield [the knife] given his position on the ground").

A reasonable jury could conclude that Franklin did not pose an imminent threat to the officers or anyone else. Under those circumstances, we conclude that Officer Kerl violated the Fourth Amendment.

2.

As to *Saucier*'s second prong, we have little trouble concluding that Franklin's Fourth Amendment right was clearly established by our precedents when Officer Kerl violated it. In conducting the clearly established analysis, we first examine "cases of controlling authority in [this] jurisdiction," *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))—that is, "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose," *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (citation omitted). The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). Instead, the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202).

"Such specificity is especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive

20

force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks and citation omitted).

That said, defendants can violate clearly established law under even "novel factual circumstances." *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (citation omitted). Thus, our "clearly established" analysis "must consider not only 'specifically adjudicated rights,' but also 'those manifestly included within more general applications of the core constitutional principles invoked.'" *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Wall v. Wade*, 741 F.3d 492, 502–03 (4th Cir. 2014)). "[A]lthough we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law," we expect police officers to exercise reason. *Williams*, 917 F.3d at 770. "In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Id.*

When Officer Kerl shot and killed Franklin in 2019, it was well established in this Circuit that carrying a weapon, without more, does not justify an officer's choice to shoot. *Cooper*, 735 F.3d at 159. In *Cooper*, we emphasized that "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Id.* Applying that rule in *Hensley*, we held that police officers who shot a man moments after witnessing him assault his daughter with a firearm still may not have been justified because the man was no longer threatening anyone by the time the

21

officers pulled the trigger. 876 F.3d at 578, 584. As outlined thus far, a jury similarly could find that Officer Kerl killed Franklin because she was threatened by his mere possession of a gun in public. In which case, Officer Kerl violated clearly established law.

The factual nuances of this case are not so divorced from Fourth Circuit precedent as to blindside police in Officer Kerl's position. Although Cooper and Hensley were shot on their own property and Officer Kerl killed Franklin in a Burger King parking lot, we see little reason why that distinction should make a difference. North Carolina allows its residents to carry firearms with a valid permit. *See generally* N.C. Gen. Stat. §§ 14-415.10 to 14-415.23. And while Officer Kerl may have had cause to believe Franklin used or possessed his firearm unlawfully, the officers *witnessed* an unlawful use in *Hensley*, 167 F. Supp. 3d at 759. To be sure, the officers gave no commands in *Hensley* while officers Kerl and Deal issued over twenty as Franklin stood still. Yet those (inconsistent) commands were ineffectual because the officers could not see his hands at all and Franklin could not comply without handling his weapon. And in any event, "[n]on-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect." *Est. of Jones*, 961 F.3d 670–71.

*       *       *

In sum, the district court erred in holding that Officer Kerl's mistake in shooting Franklin was reasonable. Therefore, she is not entitled to qualified immunity on Mrs. Franklin's § 1983 claim against her.

22

B.

Next, we deal with Mrs. Franklin's § 1983 claim against the City for ratifying Officer Kerl's Fourth Amendment violation. Section 1983 holds liable "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Municipalities are "persons" within the meaning of § 1983. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988). Thus, if "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by a municipality's officers directly caused a constitutional violation, then the municipal body may be sued directly. *Monell*, 436 U.S. at 690–91. However, a municipality may not be held liable under the doctrine of *respondeat superior*; the constitutional violation must be brought about by a municipality's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

Though establishing a § 1983 claim against a municipality is difficult, we have recognized four ways a plaintiff may accomplish that task:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). No matter which of these paths a plaintiff takes, the "official policy"

23

itself must "inflict[]" the alleged injury for the municipality to be liable under § 1983. *Monell*, 436 U.S. at 694.

Under Mrs. Franklin's theory, the City Manager's "conscious, deliberate choice to approve of the shooting [as] justified under the City's policy on use of deadly force . . . subjects the City to liability." Opening Br. at 44. She maintains that the district court erred by imposing a causation requirement because the Supreme Court, in *Praprotnik*, "expressly modified *Monell* to allow for liability by ratification by a final policymaker of the act and the basis for it." *Id.* at 41.

However, *Praprotnik* did no such thing. *Praprotnik* involved a St. Louis city employee who was transferred from one city department to another by agreement of the directors of the departments, and then was eventually laid off by the director of the second department. 485 U.S. at 115–16. The employee brought a § 1983 suit against the city, alleging that the city took these actions in retaliation for his successful appeal of an earlier suspension, in violation of his First Amendment rights. *Id.* at 116. A plurality of the Supreme Court held that a municipality can be held liable for a single constitutional violation by a subordinate when an individual with policymaking authority approves the subordinate's action. *Id.* at 127.

Applying that test to the facts, the plurality determined that the employee failed to demonstrate that any of the directors possessed the final policymaking authority necessary for municipal liability. *Id.* at 128–29. And its conclusion that the directors were not policymakers ended the case and mooted any discussion of causation. Nothing in that decision suggests that it abandoned the requirement that a municipal policy caused the

24

alleged constitutional injury.  Indeed, *Praprotnik* acknowledged that a municipality cannot properly be held liable unless the "injury was inflicted by [its] 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Id.* at 121–22 (quoting *Monell*, 436 U.S. at 694); *see also id.* ("[W]e have held that an unjustified shooting by a police officer cannot, without more, be thought to result from official policy." (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985))).

Here, the parties do not dispute that the City Manager was the final decisionmaker in the review of use of force complaints against CMPD officers under the City's ordinance.  Nor is it disputed that the City Manager exercised that authority and declared that Officer Kerl acted in conformity with CMPD's use-of-force policy and applicable law in killing Franklin. But there is a key distinction between this case and those in which a city policymaker may be liable for ratifying an action.  A city employee who suffers an adverse employment action that is later ratified by a city policymaker may trace his or her injury back to that ratification. Repealing the ratification potentially could restore the employee back to the pre-injury status quo.  But unlike in *Praprotnik*, Franklin's death is not traceable to a subordinate's decision that may be approved as final by a city policymaker.  Rather, as the district court concluded, "the City Manager's post-facto approval of an internal shooting investigation cannot possibly have caused the constitutional violation."  J.A. 1143.  Reversing the City Manager's decision cannot undo what is done.  Therefore, we affirm the district court's holding that the City is not liable under § 1983 for Officer Kerl's shooting of Franklin.

C.

Finally, we turn to Mrs. Franklin's three state-law causes of action for wrongful death, assault and battery, and negligent training. The district court granted summary judgment in favor of the defendants on all three claims. For the following reasons, we vacate that judgment as to wrongful death and assault and battery; we affirm the negligent training claim.

1.

The wrongful death statute in North Carolina provides a remedy to the personal representative of a decedent's estate when the decedent would have otherwise been entitled to damages caused by the defendant's "wrongful act, neglect[,] or default." N.C. Gen. Stat. § 28A-18-2(a). The use of excessive force is a wrongful act that can trigger the statute. *See Knibbs*, 30 F.4th at 227. Similarly, a "civil action for damages for assault and battery is available at common law against anyone who, for the accomplishment of a legitimate purpose . . . uses force which is excessive under the given circumstances." *Thomas v. Sellers*, 542 S.E.2d 283, 287 (N.C. Ct. App. 2001) (citation omitted).

North Carolina has "codif[ied] and clarif[ied] those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability." *State v. Irick*, 231 S.E.2d 833, 846 (N.C. 1977). An officer is justified in using deadly force if it is "reasonably necessary . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force." N.C. Gen. Stat. § 15A-401(d)(2).

Here, defendants can be held liable under North Carolina law for Franklin's wrongful death because a jury may determine that Officer Kerl did not act reasonably under the Fourth Amendment. Given that North Carolina law and federal law are coextensive on

26

the issue of reasonableness in this context, *see Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788–89 (4th Cir. 1998), a jury may likewise determine that Officer Kerl did not act reasonably under state law.[2]  *See* N.C. Gen. Stat. § 15A-401(d)(1)–(2).

For the same reason, Officer Kerl may be liable in her individual capacity for assault and battery.[3]  The district court's judgment on those claims is vacated and remanded.

---

[2] The defendants argue that Franklin was contributorily negligent, relying on two cases involving plaintiffs who failed to obey lawful commands.  *See London v. Hamilton*, No. CA 3:95-CV-347-MCK, 1996 WL 942865, at *9 (W.D.N.C. Nov. 27, 1996) ("[B]ecause a reasonable person would have obeyed the officers' lawful commands and would not have pointed a gun at the officers, London's contributory negligence bars any recovery"); *Hinton v. City of Raleigh*, 264 S.E.2d 777, 779 ( N.C. Ct. App. 1980) (holding that a robbery suspect who was shot by police was contributorily negligent as a matter of law by participating in the robbery, refusing to surrender when so ordered, and crouching and pointing toward officers).  If a jury views Franklin as compliant under the circumstances, he cannot have been contributorily negligent.  Alas, that is for the jury, and not us, to decide.

[3] Even if a police officer acting under the color of state law violates North Carolina's use-of-deadly-force statute, that officer may still receive public official immunity from a wrongful death suit brought against her in her individual capacity.  *See Mills v. Duke Univ.*, 759 S.E.2d 341, 344 (N.C. Ct. App. 2014).  But, because "[a] public officer sued in his official capacity operates against the public entity itself," suing a public officer in her official capacity "is simply another way of suing the public entity of which the officer is an agent."  *Thompson v. Town of Dallas*, 543 S.E.2d 901, 904 (N.C. Ct. App. 2001) (internal citation and quotations omitted).  Thus, if a municipality has waived its governmental immunity, then public official immunity does not apply.  The City has waived governmental immunity.  *See* N.C. Gen. Stat. § 160A-485.5; J.A. 589 ("As authorized by G.S. 160A-485.5, the city [of Charlotte] has waived sovereign immunity from civil liability in tort.").  And because Officer Kerl is being sued for wrongful death in her official capacity, she is not protected by immunity.

Moreover, immunity does not bar Mrs. Franklin's assault and battery claim against Officer Kerl in her individual capacity because a reasonable jury could conclude that Officer Kerl "acted outside of and beyond the scope of [her] duties."  *Clayton v. Branson*, 570 S.E.2d 253, 256 (N.C. Ct. App. 2002) (citation omitted).  Therefore, neither defendant is entitled to immunity for either claim.

27

2.

The district court rejected Mrs. Franklin's negligent training claim because she failed to show evidence of "inherent unfitness or previous specific acts of negligence" or that the City "had any actual or constructive notice of any unfitness or incompetence by Officer Kerl." J.A. 1145 (citation omitted). The problem, Mrs. Franklin argues, is that the district court relied on the wrong case law. She contends that the district court "cited erroneously to negligent supervision standards in granting summary judgment to Defendants." Opening Br. at 47. The City counters that Mrs. Franklin fails to offer "any precedent setting forth a different legal standard," and claims that "North Carolina courts routinely intertwine the phrases training, hiring, retention, or supervision." Resp. Br. at 49. A careful study of North Carolina precedents supports Mrs. Franklin's argument.

To reject Mrs. Franklin's claim, the district court cited a four-part test the Middle District of North Carolina has used to evaluate negligent training and supervision claims under North Carolina law. Under that test, a plaintiff must establish:

> (1) the specific negligent act on which the action is founded; (2) incompetence, by inherent unfitness or previous specific acts of negligence from which incompetency may be inferred; (3) either actual notice to the [employer] of such unfitness or bad habits, or constructive notice, by showing that the [employer] could have known the facts had he used ordinary care in oversight and supervision; and (4) that the injury complained of resulted from the incompetency proved.

*Sauers v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 179 F. Supp. 3d 544, 556 (M.D.N.C. 2016). *Sauers* was a federal case in which a dyslexic high school student sued the school board, alleging in part that the board negligently trained and supervised teachers who bullied him. The *Sauers* court held that the plaintiff failed to state a negligent training and

28

supervision claim because "[t]here are no facts that would suggest that the School Board knew of a need to implement a particular training policy, or of the unsuitability of any of the employees at issue here." *Id.* at 557.

Rather than rely on *Saurers*, Mrs. Franklin argues that the district court should have followed North Carolina decisions that "recognize claims of negligent training based on the general elements of negligence." Reply Br. at 23. Even were a North Carolina court to premise the City's liability for negligent training on general negligence principles, we remain unconvinced that Mrs. Franklin has adduced enough evidence to support a genuine issue of fact on this claim. Mrs. Franklin argues that Officer Kerl was negligent by using excessive force after giving Franklin improper commands and abandoning her cover. *See* J.A. 998 (use-of-force expert concluding that the officers' "poor tactical communications were contrary to generally accepted police practices and contributed to the shooting"). But the only record evidence she can muster in support of her claim that Officer Kerl's actions were proximately caused by her training is the City Manager's summary finding that the shooting was justified. Lacking other evidence of what training Officer Kerl received, the City Manager's statement does not create a genuine issue of material fact justifying reversal. Therefore, we affirm the district court's decision.

IV.

It is not lost on us that we issue this decision from the calm of a courthouse. In making our decision, we have had the opportunity to replay the unfortunate events of that March 2019 morning. Unlike us, Officer Kerl could not press pause or rewind before determining

29

whether Franklin posed an imminent threat.  Still, we remain resolute that qualified immunity is not appropriate for the disposition of this case.  The officers rushed headlong onto a scene that had subsided, established no dialogue, and shouted at Franklin loudly enough that they did not hear him try to communicate back.  In their zeal to disarm Franklin, it hardly occurred to the officers that their commands defied reality.  As a result, Franklin faced a catch 22: obey and risk death or disobey and risk death.  These facts entitle a jury of community members to decide whether Officer Kerl shot Franklin unlawfully.

For the reasons we have stated, the district court's decisions granting summary judgment for the City on Franklin's § 1983 and negligent training claims are affirmed.  The decisions granting summary judgment for Officer Kerl on the § 1983 and assault and battery claims and granting both defendants summary judgment on the wrongful death claim are vacated, and the case is remanded for further proceedings.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Chief Judge Gregory's fine opinion. I see nothing to dispel the impression that the police officers in this case were proceeding in good faith to discharge their duties. The test, however, is not one of subjective good faith but rather of objective reasonableness, and the confluence of the multiple factors the Chief Judge details warrants sending this case to a jury. In particular, the substantial evidence as to Franklin's passive demeanor throughout could lead a jury to conclude that his shooting was objectively disproportionate to any threat he posed.

The understandable grief and outrage that has greeted unjustified police shootings and chokings has unfortunately been accompanied by a less understandable desire to impair the foundations of effective police work, most notably that of Qualified Immunity. Voices beyond number have urged the elimination of this doctrine. I write briefly to say it would be wrong to draw from this case a forecast of Qualified Immunity's demise.

The immunity to be afforded is only qualified. Given the gravity of a police shooting, affording absolute immunity would be unthinkable. By the same token, the deprivation of even Qualified Immunity would be equally indefensible and deny officers the benefit of a discretionary call where their own lives may be on the line. Thus Qualified Immunity, far from being "pro-police," represents nothing more than a tenable compromise.

The judicial process and law enforcement organizations have such different dynamics. The judicial process, thankfully, is deliberative. The law enforcement function is, often necessarily, reactive. The chance to deliberate, though essential, brings with it a

31

temptation to second-guess. Qualified Immunity places a brake upon the judgment that days and hours may impose upon minutes and seconds, thus assuring that the different rhythms of the chambers and the street may be fruitfully reconciled.

The touchstone of the Fourth Amendment is, of course, one of "reasonableness." And reasonableness in turn presupposes a variety of perspectives. One person's reason may be another's rashness. Qualified Immunity accommodates the fact that different eyes can see reason in different ways, thus preserving the anomaly that reasonable mistakes are not invariably actionable ones. *See Saucier v. Katz*, 533 U.S. 194, 205–07 (2001).

The slogan "law and order" emerged as a response to the apparent disorder of the 1960s. Many came to view the catchy phrase as repressive, and truth be known, "order and opportunity" or "ordered liberty," *see Screws v. United States*, 325 U.S. 91, 95 (1945), would have been a fairer, if less politically effective, way to go. "Order" should, however, be a part of any formulation, because it is the gateway to the environment that upcoming generations will need to make the most of their lives. Qualified Immunity recognizes the indispensable nature of effective police work in preserving the order that removes the regimes of predation that would otherwise plague a community. While I support the denial of Qualified Immunity in the particular circumstances of this very close case, the demise of this important doctrine would be an incalculable social loss, one which the varied stakeholders in this wonderfully diverse country would come to regret.

32