**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-2281**

———————

TIMOTHY ROCHELL CARAWAY,

Plaintiff − Appellant,

v.

CITY OF PINEVILLE; ADAM ROBERTS, Officer; JAMON GRIFFIN, Officer; NICHOLAS FRENCH, Officer; LESLIE GLADDEN, Officer,

Defendants – Appellees.

------------------------------

NATIONAL POLICE ACCOUNTABILITY PROJECT,

Amicus Supporting Appellant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, District Judge.  (3:21−cv−00454−FDW−DSC)

———————

Argued:  December 7, 2023                    Decided:  August 6, 2024

———————

Before DIAZ, Chief Judge, NIEMEYER, Circuit Judge, and Rossie David ALSTON, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

———————

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Niemeyer joined.  Judge Alston wrote a dissenting opinion.

———————

**ARGUED:** Micheal Leray Littlejohn, Jr., LITTLEJOHN LAW, PLLC, Charlotte, North Carolina, for Appellant. Scott Douglas MacLatchie, HALL BOOTH SMITH, PC, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Lauren Bonds, Keisha James, NATIONAL POLICE ACCOUNTABILITY PROJECT, New Orleans, Louisiana; J. Christopher Mills, J. CHRISTOPHER MILLS, LLC, Columbia, South Carolina, for Amicus Curiae.

---

DIAZ, Chief Judge:

When four Pineville Police Department officers responded to a 911 call on the morning of February 1, 2020, they expected to find "a black male walking around, waving a gun at [passersby]," J.A. 378:11.  Instead, they found Timothy Caraway walking alone down the empty sidewalk with his arms at his sides and a cellphone in his left hand.

Yet the officers exited their vehicles, weapons at the ready, and shouted a series of commands for Caraway to both raise his hands and drop what they thought was a gun.  As Caraway tried to comply by reaching into his jacket with his right hand to discard the gun he'd stored there, Officers Adam Roberts and Jamon Griffin fired twelve shots between them—four of which struck Caraway.

Caraway sued the four officers and the City of Pineville, raising claims under 42 U.S.C. § 1983 and North Carolina law.  As relevant to this appeal, the district court granted summary judgment to Roberts and Griffin on each of Caraway's claims after finding that they were entitled to qualified immunity and public official immunity on Caraway's Fourth Amendment excessive force and state-law assault and battery claims, respectively.

Caraway appeals.  We think it fair to say, with the benefit of hindsight, that the officers should have handled this encounter differently.  But that's not our role.  Instead, we ask whether the officers' use of deadly force was reasonable.

Because the record shows that in the moments before the shooting, Caraway's gun was pointed at two of the officers, we find that it was.  Accordingly, we affirm the district court's grant of summary judgment to the officers.

3

I.

Because this is an appeal of an order granting summary judgment, "we recount the facts in the light most favorable to the non-movant, [Caraway]," *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011) (en banc), and draw all reasonable inferences in his favor, *id.* at 531.

A.

On the morning of February 1, the Pineville Police Department received a 911 call about a Black man pointing or waving a gun near a fast-food restaurant on Polk Street in Pineville, North Carolina.  Officers Leslie Gladden and Jamon Griffin were first to respond to the call.

Officers Nicholas French and Adam Roberts also responded, each traveling separately.  As Roberts drove to the scene, he heard over his radio that the suspect, "a [B]lack male with black, long dreads, wearing a tan jacket," J.A. 497:17–18, "should be holding a handgun, black in color," J.A. 84 (Roberts's BWC[1]) at 1:13–1:18.

French and Roberts arrived first.  French parked his vehicle in the middle of Polk Street "to the south of [Caraway], exited the vehicle with his department-issued patrol rifle, and began following [Caraway] from behind as he walked north on the west sidewalk of Polk Street." *Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 567 (W.D.N.C. 2022).  Roberts parked his vehicle behind French's, and also got out with his rifle drawn.  French,

---

[1] "BWC" refers to the officers' body-worn camera footage.

4

a few yards ahead of Roberts and already out of his vehicle, then began walking from the middle of Polk Street to the sidewalk, with Roberts following behind him.

Body camera footage shows Caraway walking northbound on Polk Street, alone, with his back to the officers, and his arms at his side. Surveillance footage from a car dealership across the street similarly shows Caraway walking alone down the empty sidewalk with his hands at his side.[2]

Just as French and Roberts moved closer to Caraway, Gladden and Griffin arrived. "They exited their patrol car and similarly began to approach [Caraway] from behind with their department-issued [firearms] drawn." *Id.*

"[Caraway] was alerted to the officers' presence when French issued the first of a string of commands[.]" *Id.* As the officers approached Caraway from behind and stood several yards away from him, French called out, "Hey man, get your hands up." J.A. 84 (Roberts's BWC) at 2:26–2:27. With his gun raised, Roberts immediately followed French's command with, "Let me see your hands!" as French yelled, "Get your hands up!" J.A. 84 (Roberts's BWC) at 2:27–2:29.

The first few seconds of this exchange were partially captured by the car dealership's surveillance cameras. Caraway is seen walking down the sidewalk moving away from the officers, then looking back in their direction before raising his hands (holding a cell phone in his left hand) above his head—ostensibly after hearing the first

---

[2] The officers concede that at this point in the encounter, the only item in Caraway's hands was a black cell phone.

orders from French and Roberts.  He then turns and walks backwards a few steps while facing the officers, with his hands still raised above his head.

Joining in the chorus of commands, Gladden—believing Caraway had a weapon in his hand—shouted, "Drop the gun!"  J.A. 84 (Roberts's BWC) at 2:29.  Caraway thought the command required that he remove the gun he was carrying in his jacket pocket, not the phone he held in his hand.  So he reached into his jacket.  And as he did so, he began to kneel, his right knee settling on the sidewalk.

In the meantime, Roberts and French continued their advance down the sidewalk with their rifles raised.  French then commanded Caraway to "Keep 'em both up," while Gladden shouted, "Get on the ground!"  J.A. 84 (Roberts's BWC) at 2:30.  French then issued his third "Get your hands up!" command.  J.A. 84 (Roberts's BWC) at 2:31–32.  At that point, a shot was fired.

Caraway fell face-first onto the sidewalk one second after the first shot was fired. The shots continued in quick succession as he lay prone on the ground.  Over the gunfire, Gladden yelled, "Stop! Stop!" and the shooting ceased.  J.A. 84 (Roberts's BWC) at 2:36–2:38.

All told, Roberts fired three shots, while Griffin fired nine.

Once the shooting stopped, the officers approached Caraway, who was still lying face down on the sidewalk, his gun and his phone next to him on the ground.  Gladden yelled at Caraway to "Get on the fucking ground!" and to "Put your hands up!"  J.A. 84 (Roberts's BWC) at 2:40–2:42.  More calls for Caraway to "put your hands up" followed,

6

J.A. 84 (Roberts's BWC) at 2:43–2:44, to which Caraway responded, "I can't, I can't!  I can't, Officer, I can't," J.A. 84 (Roberts's BWC) at 2:45–2:49.

Gladden then straddled Caraway on the ground, placing his leg on Caraway's back so Roberts could handcuff him.  As he was handcuffed, Caraway said, "I'm sorry, I was just doing what I was told to do.  Y'all said 'drop it,' I'm sorry."  J.A. 85 (Griffin's BWC) at 0:30–0:35.

Roberts rolled Caraway over onto his back, checked for injuries, and began administering first aid.  Caraway was later taken to the hospital, "where he remained for approximately forty-eight hours to receive treatment for four bullet wounds."[3]  *Caraway*, 639 F. Supp. 3d at 568.

## B.

### 1.

The North Carolina State Bureau of Investigation (SBI) investigated the shooting. The SBI interviewed all four officers involved, as well as two eyewitnesses.  We summarize the officer interviews below.

#### Griffin

Griffin—who was standing off to Caraway's side in the middle of Polk Street when the shooting took place—said that as the other officers were calling for Caraway to show his hands and "drop the weapon," J.A. 380:5, he saw Caraway turn around, put his hands

---

[3] Caraway was shot in his neck, "right flank," left forearm, and left index finger. J.A. 892.

in his pockets, and then, "as [Caraway's] hands c[a]me out, [he] [could] see a gun come out in [Caraway's] hand, and then [he] [could] hear a shot," J.A. 380:23–25. "Because when [Caraway] turned, he was facing directly at [French and Roberts]," Griffin explained, "[he] took that as an immediate threat towards [French and Roberts], and [he] immediately, after [he] heard the shot, [he] began firing [his] service weapon . . . ." J.A. 381:4–9. When asked whether Caraway had ever pointed the gun at him, Griffin responded, "No." J.A. 419:5–9.

Griffin also saw Caraway "go down" "immediately" after the first shot, J.A. 398:23, and said that he "never saw where [Caraway's] gun went . . . from [his] angle," J.A. 399:2–3, but he could see Caraway "still . . . moving around." J.A. 403:21–22. Because he remained concerned for French's and Roberts's safety, Griffin told investigators, he "start[ed] firing," J.A. 404:25, at Caraway "to stop the threat," J.A. 404:3.

**Roberts**

Roberts said that after Gladden issued the command to drop the gun, he saw a gun "in [Caraway's] right hand, pointing in [his and French's] direction," before he heard "two to three shots, and then [he] fired one shot."[4] J.A. 518:25–519:2. Roberts also noted that Caraway "[went] down" after the first shot. J.A. 542:3–4.

**French**

French explained that, in response to the command to get his hands up, Caraway (who had his back to French and Roberts) "almost immediately" put his hands up, at which

---

[4] As noted earlier, the investigation determined that Roberts fired three shots in total.

point French could see he had a "large, black cell phone" in his hand.  J.A. 568:18, 20–23.

Then, when Caraway began to respond to the commands to drop the gun, French recalled

that Caraway turned, dropped his right hand in his pocket, and pulled out a gun.  More

specifically, French told the investigator: "I do remember very clearly that when [Caraway]

came out of his pocket, he was holding it in like a shooting grip . . . when he came out of

his pocket, he had a master grip on it."  J.A. 597:23–598:16.  He also stated that "when

[the gun] came out, it was pointing towards us."  J.A. 599:13–14.  But he clarified that

Caraway "never raised it" and "[h]e didn't bring it up to shoot."  J.A. 599:9–11.

By then, French explained, the shooting started.  And "[a]s soon as the shots

started," French said, "[Caraway] went like a sack of potatoes to the ground," J.A. 571:19–

21, and the gun "c[a]me right out of his hand when he went to the ground," J.A. 571:24–

25.  And after Caraway hit the ground, French recalled, the shots continued, and he "could

see [the shots] hitting the ground around [Caraway]."  J.A. 572:10–11.

**Gladden**

Gladden told the SBI that after he yelled at Caraway to drop the gun—because

Caraway "appeared to have something in his hand," J.A. 669:17—Caraway "spun all the

way around," J.A. 668:9–10, and "dug his hand" in his pocket, J.A. 688:22.[5]  Then,

Gladden explained, while the shots were being fired, he saw the gun "moving . . . out of

[Caraway's] hand."  J.A. 669:3–5.  "But by the time I could clearly make out a gun,"

---

[5] Right before the shooting started, Gladden "could not see [Caraway's] right hand," J.A. 692:9, the hand holding the gun.

9

Gladden told the investigator, "it was—he was falling . . . He went face-first."  J.A. 670:17–21.

2.

The Pineville Police Department also retained a private agency to investigate the shooting.  The investigators, relying on the SBI's witness interviews, body camera footage, and other evidence, "prepared [a] report for review by the Pineville Police Department." J.A. 858.  The district court relied almost exclusively on this report in its summary judgment order.

Though largely a summary of the SBI's investigation, the report does make a few other findings, including, for instance, that (1) Caraway can be seen on the body camera footage right before the shooting "holding the handgun in his right hand" while "on his right knee and [with] his left arm raised in the air," J.A. 885; (2) "it is probable[] that the wounds [Caraway] received to his shoulder and neck, came from Officer Robert[s's] rifle," J.A. 883; (3) "there is a high probability that Officer Griffin[,] while deploying his handgun, struck [Caraway] in [his left forearm and left first finger] as [Caraway's] arm was raised in the air," J.A. 887; and (4) "there is a high probability that Officer Griffin shot [Caraway] in his rear right flank[] as he was on the ground," J.A. 893.

Caraway doesn't dispute most of these facts.  He does, however, dispute the officers' assertions—and the district court's findings—that he acted aggressively during the encounter and that he pointed his gun at the officers in the moments before the shooting. We discuss these arguments in more detail in our analysis below.

10

C.

Caraway sued the officers and the City of Pineville[6] in North Carolina state court, raising an excessive force claim under 42 U.S.C. § 1983 against Griffin and Roberts, alleging that they used excessive force against him, in violation of the Fourth and Fourteenth Amendments;[7] a malicious prosecution claim under 42 U.S.C. § 1983 and North Carolina law against all four officers; a fabrication of evidence claim under 42 U.S.C. § 1983 against all four officers; a failure to train or supervise claim under 42 U.S.C. § 1983 against French and Gladden; an assault and battery claim under North Carolina law against Roberts and Griffin; and a false arrest claim under N.C. Gen. Stat. §§ 15A-401(a)-(f) against all four officers.

The defendants removed the case to federal court. After discovery, the parties cross-moved for summary judgment. The defendants moved for summary judgment on all counts in Caraway's complaint, while Caraway moved for partial summary judgment on his excessive force claim as to Officer Griffin.

---

[6] Though the complaint names the City of Pineville as a defendant, it asserts each claim for relief only against the individual officers. In any event, Caraway appeals only the district court's grant of summary judgment as to two of the officer-defendants, so we need not address the City's potential liability any further.

[7] The district court appropriately declined to consider Caraway's Fourteenth Amendment excessive force claim based on the Supreme Court's decision in *Graham v. Connor*. *Caraway*, 639 F. Supp. 3d at 570 n.3 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In *Graham*, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—during an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395.

11

The district court granted the defendants' motion for summary judgment in full. As to Caraway's excessive force claim against Roberts and Griffin, the district court concluded that the officers were entitled to summary judgment because "Roberts['s] and Griffin's decisions to shoot [Caraway] [were] [not] proscribed by clearly established law." *Caraway*, 639 F. Supp. 3d at 571. The district court elaborated that although it was clearly established that "the Fourth Amendment proscribes shooting a victim who merely grasps a firearm in a non-threatening manner," the evidence showed that Caraway "abruptly placed his hand in his pocket and pulled out his firearm as the officers approached," and "[a] reasonable jury could find the officers were justified in interpreting this sudden act as a threat." *Id.* at 571–72.

The district court also concluded that the officers' use of deadly force was reasonable because they "fired their weapons only after [Caraway] withdrew his own," and "they ceased the moment they knew" he was no longer holding it. *Id.* at 574.

Turning to the state-law claims for assault and battery, the district court reasoned that "[b]ecause [it] found Roberts and Griffin are entitled to qualified immunity on the federal claim, they are likewise entitled to public official immunity on the assault and battery claim . . . ." *Id.* at 586. And it found for defendants on Caraway's malicious prosecution, fabrication of evidence, failure to train or supervise, and false arrest claims on these grounds as well. *See id.* 578–89.

12

On appeal, Caraway challenges only the district court's grant of summary judgment for Roberts and Griffin on his Fourth Amendment excessive force and state-law assault and battery claims.[8]

## II.

We review de novo "district court decisions on motions for summary judgment, qualified immunity, and state public official immunity." *Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). In reviewing a summary judgment determination, we view the facts in the light most favorable to the nonmovant, "even if a jury could well believe the evidence forecast by the [moving party]." *Franklin*, 64 F.4th at 525 (cleaned up).

## A.

Caraway makes several arguments on appeal, going to the merits of the district court's order and to its application of the requisite standard of review.

---

[8] As the defendants note, "Caraway has apparently abandoned his claims for false arrest, malicious prosecution, fabrication of evidence, and failure to train." Appellees' Br. at 10. Caraway doesn't contend otherwise, so we don't address them here. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue." (cleaned up)).

13

Starting with the latter proposition, Caraway argues that the district court "failed to satisfy the summary judgment standard in its recitation of the facts[,]" instead "adopt[ing] a partisan view of the record and fail[ing] to draw reasonable inferences from the evidence in the light most favorable to Caraway as to the circumstances leading up to the shooting." Appellant's Br. at 19. In this vein, Caraway also challenges the district court's Fourth Amendment analysis, arguing that the district court erred in failing to distinguish between the shots fired before and after he had fallen to the ground.

On the merits, Caraway asserts that the district court erred in determining that Griffin and Roberts were entitled to qualified immunity on his Fourth Amendment claims and to public official immunity on his assault and battery claims.

We address each argument in turn.

1.

Caraway first argues that the district court misapplied the summary judgment standard because the evidence created genuine disputes of material fact.[9]

According to Caraway, the district court's gravest mistake was relying on the internal investigation report to determine that after the officers got his attention, Caraway "turned, thrust his right hand into his pocket, and pulled out a handgun with the barrel facing the officers." Appellant's Br. at 17 (quoting *Caraway*, 639 F. Supp. 3d at 573). Caraway says this finding was erroneous because whether he was pointing a gun at the

---

[9] Amicus National Police Accountability Project similarly accuses the district court of "present[ing] Defendants' version of the facts as true and only referenc[ing] [Caraway's] alternative version of the facts as a less credible afterthought." Amicus Br. at 17.

officers before they fired "is the most contested fact in this action," *id.*, so it should have been resolved in his favor as the nonmoving party. [10]

In support, Caraway broadly asserts that the district court's finding that he pointed his gun at the officers "is contradicted by the video evidence, eye-witness testimony, and Caraway's testimony." *Id.* at 14. He then points to the following evidence to support this proposition: (1) Griffin's SBI testimony that Caraway never pointed a gun directly at him; (2) French's SBI testimony that "Caraway never raised his handgun in an upward position or pointed it at any person," *id.* at 18; (3) testimony from eyewitnesses stating that Caraway didn't seem to be reaching for a gun; and (4) his own deposition testimony, which he contends establishes that he "never pointed a gun at the officers," *id.* at 17.

We recognize the peculiarity of the district court's choice to largely ignore evidence like the body camera and surveillance footage in favor of the internal investigation report commissioned by the Pineville Police Department. But we can't agree that the district court erred in granting summary judgment to the officers, even when considering that other evidence and viewing it in Caraway's favor, as this evidence fails to create a triable issue of fact.

---

[10] Caraway vigorously disputes this fact in his brief. But a brief is not evidence. *See, e.g.*, *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence."); *Estrella v. Brandt*, 682 F.2d 814, 819–20 (9th Cir. 1982) ("Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment."); *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence.").

15

Begin with Caraway's insistence that the district court's "characterization that Caraway's movement," in reaching into his pocket for the gun, "was 'sudden'" was mistaken because "there is no evidence to support this inference." *Id.* at 19–20. Not so. According to the Report, French told SBI investigators that Caraway reached his right hand into his pocket and "came out fast with a pistol in his hand." J.A. 871. Relatedly, Gladden reported to the SBI that he observed Caraway stick his right hand into his pocket "as he spun around" "very fast."[11] J.A. 874.

Next, take Caraway's statements disclaiming that he pointed the gun at the officers, whether intentionally or unintentionally, while trying to comply with their orders to discard it. At his deposition, Caraway testified only that when he pulled the gun out of his pocket, he "tried to toss it to the right of [him] as quickly as [he] possibly could." J.A. 259:9–15. But he said nothing about where the gun was pointed when he pulled it out of his pocket, let alone that he aimed it away from the officers. So it's difficult to see how his testimony disputes the officers' accounts.

Caraway's citation to French's statements to the SBI is similarly unavailing. During the interview, French said that when Caraway pulled the firearm out of his pocket, "he was

---

[11] The dissent objects to this characterization of Caraway's movements, writing that the assertion that Caraway spun around is contradicted by the video evidence. *See* Dissenting Op. at 33–34. Aside from the fact that the video evidence is inconclusive on this point—the entire exchange, from the first of the shouted commands to the final shot, was over in a matter of seconds—the dispositive fact here isn't the manner in which Caraway turned to face the officers, but that Caraway's gun, however briefly, was pointed in their direction as he disposed of it.

16

holding it in like a shooting grip," J.A. 597:25–598:1, "he had a master grip on it," J.A. 598:15–16, and that "he never raised it" or "br[ought] it up to shoot." J.A. 599:9–11.

But critically, French also said that "[w]hen it came out, it was pointing towards us." J.A. 599:13–14. While these statements suggest that Caraway never intentionally took aim at the officers, they support (rather than undermine) a finding that his gun was, if even for a moment, pointed at the officers.

The eyewitness accounts from Kevin Strudwick and James Peniston—two employees of a nearby business who observed some of the encounter from inside their vehicles—are also not enough to create a genuine issue of fact as to where the gun was pointed before Caraway discarded it.

By Strudwick's own account, he "couldn't tell what [Caraway] was doing with his hands." J.A. 758:5–6. Rather, Strudwick explained that he could see Caraway's hands move "from the up position" when Caraway began to kneel, to a lower position "to either brace hi[m]self or to maybe reach for a gun" as he reached the ground. J.A. 767:20–22. But, as Caraway's back was to him, Strudwick "didn't see what [Caraway's] hands w[ere] doing." J.A. 767:22–23. Because Strudwick's observations don't contradict the officers' account as to where the gun was pointed, his account cannot create a triable issue of fact. *See Anderson v. Russell*, 247 F.3d 125, 130–31 (4th Cir. 2001).

So too with Peniston. As relevant here, Peniston reported that Caraway's hands "were not out," J.A. 830:17, and that "[a]s far as [he] knew," J.A. 832:12, there was nothing in Caraway's hands. But his statement doesn't raise a genuine issue of material fact

17

because Caraway doesn't dispute that he had two items in his hands during the encounter—a cell phone and a gun.

That leaves Griffin's account from the SBI interview. Recall that Griffin agreed with the investigator's statement that Caraway never pointed a gun at *him*. But during the shooting, Griffin was standing in the road on Polk Street, not on the sidewalk with French and Roberts. So his statement doesn't put in dispute the testimony of the other officers—who were standing directly in front of Caraway on the sidewalk—that the gun was pointed at *them*.

Nor can we agree with Caraway's bald assertion that the video evidence is enough to create a genuine issue of material fact. The video evidence from the surveillance and body cameras (which we have viewed) does not "blatantly contradict[]" either side's version of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Rather, it provides little assistance in resolving the parties' disputes over" the orientation of the gun. *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 277 (4th Cir. 2011). So we reject this argument as well.

In sum, there was no genuine issue of material fact that the gun was pointed in the direction of at least some officers. The district court didn't err on this point.

2.

We now turn to Caraway's arguments challenging the district court's grant of qualified immunity to Griffin and Roberts.

> Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States. Nevertheless, a government official sued under

18

§ 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself.

*Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).  And the defense of qualified immunity is meant to "provide[] ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A court's qualified immunity analysis asks two questions: "(1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation."  *Aleman*, 80 F.4th at 284.  "If the answer to either question is 'no,' the officer being sued is entitled to qualified immunity."  *Id.*

a.

We begin with the first prong, which "asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer[s'] conduct violated a [federal] right."  *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (cleaned up).

Caraway contends that the officers violated the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  When a plaintiff contends that a seizure violated the Fourth Amendment, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Graham*, 490 U.S. at 397.

Whether an officer's actions in firing his weapon were objectively reasonable is "a pure question of law" for the court to determine.  *Scott*, 550 U.S. at 381 n.8.  "We assess the reasonableness of [an] officer's conduct based on the circumstances confronting the

19

officer immediately prior to and at the very moment he fired his weapon." *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) (cleaned up).

Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Thus, a court's reasonableness analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

It follows that the use of deadly force in carrying out a seizure isn't per se unreasonable. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). On the contrary,

> if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12.

We evaluate the reasonableness of an officer's use of force by applying the *Graham* factors. That inquiry "requires careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight."[12] *Graham*, 490 U.S. at

---

[12] In this Circuit, we've also considered a fourth factor: "the extent of the plaintiff's injuries." *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024) (cleaned up).

20

397. This court has recognized that "[i]n excessive force cases where an officer uses deadly force, the second *Graham* factor"—whether the suspect posed an immediate threat to the safety of the officers or others—"is particularly important." *Franklin*, 64 F.4th at 531.

That someone has a gun is not enough to justify an officer's use of deadly force; "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Cooper*, 735 F.3d at 159. "[P]ointing, aiming, or firing [a] weapon," for example, are all sufficient—but not necessary—movements to constitute such a threat. *Id.* at 159 n.9; *accord Elliott v. Leavitt*, 99 F.3d 640, 642–44 (4th Cir. 1996).

As we recognized in *Cooper*, we have concluded "several" times that "a police officer was entitled to qualified immunity after shooting an individual whom the officer mistakenly believed to be armed." 735 F.3d at 159. In other words, we've determined that the use of deadly force was reasonable when "the objective basis for the threat was real, but the gun was not." *Id*. "By contrast, we have reached the opposite conclusion in cases where the gun was real but the threat was not." *Franklin*, 64 F.4th at 531 (cleaned up). Thus, the relevant inquiry here is not whether Caraway threatened the officers, but whether there was an objective basis for the officers to believe that he presented a threat.

It's easy to say (in the peace and quiet of chambers) that Caraway's actions right before he moved to withdraw the gun from his pocket appeared calm and nonthreatening. But on the street that February, the officers had an objective basis to believe that Caraway was a threat in the moments right before the shooting. That's because the undisputed

21

evidence shows that just before the officers fired, Caraway's gun was pointed at French and Roberts.[13]

We therefore can't find that the officers' use of deadly force in response to this perceived threat was unreasonable. *See Stanton v. Elliott*, 25 F.4th 227, 234–35 (4th Cir. 2022) ("A police officer need not wait for a suspect to shoot before using deadly force. And an officer needn't see the weapon in a suspect's hands to find him objectively dangerous." (cleaned up)). That the officers saw Caraway holding a gun that they reasonably believed would be used against them was enough to justify their decision to deploy deadly force.

Our precedent supports this conclusion. Consider first our decision in *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). There, police officers conducting a nighttime "sting" operation to recover guns and drugs monitored a parking lot for illicit activity. *Id.* at 214. Slattery was a passenger who remained behind in the car while the driver exited to make a drug deal with an undercover officer. *Id.* at 215. When the other officers moved in to arrest the driver, Officer Rizzo approached the vehicle Slattery was sitting in and ordered Slattery to raise his hands, which he could not see clearly, "at least twice." *Id.* As Rizzo moved closer, he observed that Slattery's left hand "appeared to be partially closed around an object." *Id.*

---

[13] The district court framed the relevant inquiry as "whether it was reasonable to perceive [Caraway's] act of suddenly drawing his firearm as an immediate threat." *Caraway*, 639 F. Supp. 3d at 575. But it also found, as we do here, that "Roberts and Griffin reasonably perceived a threat" because Caraway had "turned, thrust his right hand into his pocket, and pulled out a handgun with the barrel facing the officers." *Id.* at 573.

Rather than complying with the commands to raise his hands, Slattery "turned his entire upper body towards the officer, who could still not see Slattery's left hand," so Rizzo, believing Slattery to be "coming at him with a weapon, shot [Slattery] once in the face with his revolver." *Id.* Though Slattery's "weapon" turned out to be a beer bottle, *id.*, we concluded that the use of deadly force was justified because "a reasonable officer could have had probable cause to believe that [Slattery] posed a deadly threat," *id.* at 216.

As another example, in *Elliott v. Leavitt*, we held that when a suspect points a gun at an officer despite being commanded to drop the weapon, the officer's resulting use of deadly force is reasonable. 99 F.3d at 642–44. And in *Anderson v. Russell*, we determined that "because [the officer] had sound reason to believe that [the suspect] was armed, [the officer] acted reasonably by firing on [the suspect]" right after the suspect lowered his arms toward the bulge in his pocket rather than raising his hands as he'd been ordered to do. 247 F.3d at 131.

These cases illustrate that the use of deadly force is constitutional when it was objectively reasonable for an officer to believe that, in the moments immediately before that force is deployed, the suspect posed a serious threat of physical harm.

And the cases also stand in stark contrast to our more recent decisions finding that the shooting officer's actions were objectively *un*reasonable even though the suspect was armed. Key to those decisions was that the suspects, "though armed, were not threatening the officers or others with their weapons at the moment they were shot." *Aleman*, 80 F.4th at 287.

23

Take *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023). There, as here, officers responded to a 911 call about a disturbance involving a man waving a gun around at a fast-food restaurant. "[A]fter demanding to see [the suspect's] hands, the officers then pivoted to an inconsistent instruction, ordering him to drop his gun." *Id.* at 533.

Like Caraway, Franklin wasn't holding a gun at the time the officers demanded he drop it; in response to the officers' conflicting commands, Franklin "slowly reached into the right side of his jacket and retrieved a black handgun with his right hand." *Id.* at 526. But unlike in this case, "[w]hen Franklin's gun was in [the shooting officer's] view, . . . it was not in a firing grip," rather, "Franklin held it by the top of the barrel slide with the grip-side closest to the officers and the muzzle pointed away from them." *Id.*

The evidence further showed that as Franklin sought to comply with the orders by removing the weapon from his jacket, he "pointed it at no one." *Id.* at 533. But the officer nevertheless "discharged her weapon twice, striking Franklin in the left arm and abdomen." *Id.* at 526. We declined to grant qualified immunity because "[a] reasonable jury could conclude that Franklin did not pose an imminent threat to the officers or anyone else." *Id.* at 534.

The problem for Caraway is that at least two officers saw his gun pointed at them. And there's no contrary evidence. *Cf. Hensley ex. rel. North Carolina v. Price*, 876 F.3d 573, 583 (4th Cir. 2017) (finding Fourth Amendment violation where plaintiffs' evidence showed that the decedent "had a handgun, but never raised it toward the [officers,]" "made no threatening statements or actions toward anyone in the moments immediately preceding the shooting," and "k[ept] the handgun pointed toward the ground at all times").

24

The district court did not err in finding that Caraway posed an immediate threat to the officers.

b.

The other *Graham* factors also favor the officers. As the district court concluded, "the officers' response was objectively justified and reasonable considering the perceived severity of the crime at issue[:]" *Caraway*, 639 F. Supp. 3d at 573, a man pointing or waving a gun in a public place. And we find under the third factor, which looks to whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, that it was objectively reasonable for an officer at the scene to believe that Caraway was attempting to resist arrest by pulling his gun to threaten them.

Even assuming the fourth factor—the extent of Caraway's injuries—both applies in the deadly force context and weighs in his favor, it's not enough to overcome the other factors, particularly given that the second (and most important) factor—the immediate threat Caraway posed to the officers—weighs decidedly against him.

In sum, the district court correctly determined that the officers are entitled to qualified immunity because their use of deadly force did not violate the Fourth Amendment.

B.

Caraway makes one other argument that warrants a response. In his view, the district court erred by failing to analyze the reasonableness of the shots fired at the beginning of the encounter separately from those fired after he had fallen to the ground.

25

This court has sometimes done just that on the basis that the "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). In *Waterman*, for instance, we found—of the "approximately-six-second period" in which the decedent's car "lurched forward" toward the officers, then passed them, *id.* at 475—that the reasonableness of the officers' use of deadly force during that period could appropriately be analyzed by separating the encounter into two segments: the periods before and after the decedent's car had passed the officers, *see id.* at 482. And after so finding, we concluded "that the record, viewed in the light most favorable to the Estate, show[ed] that once [the decedent's] vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots." *Id. at* 482.

We applied the same segment-by-segment analysis in *Brockington v. Boykins*, a case in which an officer fired at an unarmed suspect "at least twice" before the suspect fell "off the stairs onto the cement landing below," where he landed flat on his back. 637 F.3d 503, 505 (4th Cir. 2011). Then, while the suspect was laid out on his back, the officer "stood directly over him and fired at least six [more] shots at close range." *Id.*

"Brockington conceded at oral argument that the initial use of deadly force to subdue him was reasonable." *Id.* at 507. However, we held that, while the initial two shots were reasonable, "there was a clear break in the sequence of events" between when those shots were fired and when Brockington "lay helpless on the ground." *Id.* And in evaluating the latter six shots separately from the first two, we concluded that the use of deadly force during that half of the encounter was unreasonable. *See id.* at 507–08.

26

Similarly, Caraway would have us parse the shooting into two distinct phases—the periods before and after he fell to the ground. As he asserts, "[t]here is no dispute shots . . . were fired while Caraway was face-down on the sidewalk." Appellant's Br. at 11. But given that the entire sequence of shots lasted only three or four seconds, we decline to extend *Waterman* to these facts.

Although the video evidence offers a general overview of the shooting, it's hardly precise enough for us to conduct the frame-by-frame, second-by-second, shot-by-shot analysis that Caraway would have us undertake. *See, e.g.*, *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016) (recognizing that in some cases, "[t]he better approach . . . is to view the reasonableness of the force in full context, with an eye toward the proportionality of the force in light of the totality of the circumstances." (cleaned up)). So we decline to do so.

## C.

Finally, we briefly address the district court's grant of summary judgment to Roberts and Griffin on Caraway's state-law assault and battery claims.

"Under North Carolina law, a plaintiff may maintain a civil action for assault arising from an arrest if it is accomplished by excessive force." *Hensley*, 876 F.3d at 586 (discussing North Carolina state-law excessive force assault claim); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (discussing state-law assault and battery claim). Like a Fourth Amendment excessive-force claim, "'[t]he question of whether an officer has used excessive force is judged by a standard of objective reasonableness.'" *Id.* at 587 (quoting *Jordan v. Civ. Serv. Bd.*, 570 S.E.2d 912, 917 (N.C. Ct. App. 2002)).

27

As previously discussed, even taking all the evidence in the record—including the video evidence—in the light most favorable to Caraway, the officers' conduct was objectively reasonable. Thus, Caraway's assault and battery claims fail as a matter of law.

But even if the claims were viable, they couldn't proceed, as Roberts and Griffin are entitled to public official immunity under North Carolina law. "Distinct from qualified immunity under § 1983, which is a purely objective analysis, North Carolina's public official immunity doctrine 'involves a determination of the subjective state of mind of the governmental actor.'" *Knibbs v. Momphard*, 30 F.4th 200, 227 (4th Cir. 2022) (quoting *Andrews v. Crump*, 547 S.E.2d 117, 123 (N.C. Ct. App. 2001)). Under North Carolina law, "a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012).

"Public official immunity is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Hensley*, 876 F.3d at 587 (cleaned up). This court has recognized that "the use of deadly force in violation of North Carolina's deadly force statute, N.C. Gen. Stat. § 15A–401(d), is an act done contrary to an officer's known duties." *Knibbs*, 30 F.4th at 227–28. Like the qualified immunity analysis, an officer's use of deadly force is justified under North Carolina law "when it is or appears to be reasonably necessary . . . to defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force." N.C. Gen. Stat. § 15A-401(d)(2)(a).

28

Caraway argues, under the "malice" exception, that "for the same reasons showing the District Court improperly decided the federal excessive force claims, reversal on such claims revives Caraway's state law claims as well."[14]  Appellant's Br. at 47.

But we've already held that under the Fourth Amendment, it was reasonable for the officers to use deadly force because they believed they faced a threat of serious bodily injury or death.  So we likewise affirm the district court's decision to grant the officers public official immunity for the North Carolina state law claims because they acted without malice in using deadly force.

*   *   *

For these reasons, we affirm the district court's judgment.

<em>AFFIRMED</em>

---

[14] Aside from a passing mention in his reply brief, however, Caraway doesn't argue that the officers acted either outside the scope of their authority or corruptly.  *See* Reply Br. at 15 (arguing that "[q]uestions remain as to whether [the officers' use of deadly force] was reasonable under the circumstances and if they acted with malice *or* corruption" (emphasis added)).  So we don't address those exceptions to the public official immunity doctrine here.

ALSTON, District Judge, dissenting:

The majority has engaged in a thorough review of the background and analysis of the matter before the Court. And essentially, there is little disagreement with most of the factual predicates underlying its opinion. Respectfully though, I disagree with how these salient facts should be construed.

Critical to the analysis in my view is that the majority recognizes that Timothy Caraway was complying with officer commands to drop his weapon at the time the officers shot him. Yet, the majority takes the somewhat counter-intuitive position that Caraway was somehow "too quick" to comply with the officers' instructions or that his compliance was in some way unexpected such that the officers' twelve shots were a reasonable response to his compliance with their commands. It is clear from oral argument and the majority's opinion in this case, that there was nothing that Caraway could have done during the incident that would have enabled him to avoid being shot or that would have rendered the shooting unreasonable. In my view, Caraway was essentially presented with a "Hobson's Choice," and thus no choice at all, to either comply explicitly with the officers' directions (and be shot twelve times) or not comply and potentially suffer worse consequences. This cannot be the way § 1983 was meant to be construed. Moreover, I find this case to be on all fours with this Court's binding and published decision in *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023). I do not see an analytical framework where the majority decision in this case and that in *Franklin* can be read to co-exist. And I suggest that *Franklin* is the more viable framework. Therefore, I respectfully dissent.

30

In determining summary judgment, our precedent instructs that a district court is required to take not only the facts, but also the justifiable inferences arising from those facts, in the light most favorable to the non-moving party. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 565 n.1 (4th Cir. 2015) (recognizing "we view the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party" (internal quotation marks omitted)). The district court and the majority failed to do this because both attach a negative inference to the fact that Caraway – in compliance with officer instructions – removed the gun "very fast." J.A. 874. The majority fails to explain why Caraway's attempts to "quickly" comply with officer instructions should be viewed in a threatening and negative light. Surely, the officers' expectations are that their commands will be complied with. And, as the caselaw relied upon by the majority notes, any delay by Caraway in responding to officer commands would also be construed against him. *See Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (where the plaintiff failed to comply with officer commands to raise his hands).

Moreover, the district court and the majority draw the negative inference from Caraway's withdrawal of his gun – in compliance with officer commands – that Caraway was threatening the officers. This, despite testimony from other officers that the gun was not drawn to shoot and the acknowledgment by the majority that Caraway was complying with officer commands. J.A. 599:9–11 (Officer French testifying Caraway "never raised

31

it" and "[h]e didn't bring it up to shoot").[1]  Indeed, the evidence in the record, particularly the video surveillance in combination with the body camera footage, appears to demonstrate that Caraway presented *no threat* to the officers.  The video footage shows an unsuspecting Caraway walking normally down the sidewalk.  J.A. Vol. III (Mercedes Benz Footage #1) at 2:06.  When Caraway hears shouting from behind him, he turns slowly while continuing to walk backwards.  *Id*. at 2:10. When instructed to raise his hands, Caraway does so. J.A. 84 (Roberts's BWC) at 2:26–2:27 ("get your hands up"); J.A. Vol. III (Mercedes Benz Footage #2) at 0:05 (raising hands).[2]  When Caraway receives the almost simultaneous instructions to "get on the ground" and "drop the gun," Caraway begins to drop to his knees and reaches for the gun that he knows he possesses to follow instructions. J.A. 84 (Roberts's BWC) at 2:29-30; J.A. Vol. III (Mercedes Benz Footage #1) at 2:13 (showing Caraway begin to kneel).  Then the first shot is fired.  J.A. 84 (Roberts's BWC) at 2:31-32.  Thus, Caraway was obeying all officer commands – including a command that

---

[1] The majority too easily discounts this testimony from Officer French.  The important question is based on an assessment of whether the officers were "*threatened* with the weapon." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (emphasis in original). Officer French's testimony is essentially that, regardless of how the gun came out of Caraway's pocket, he was able to determine that there was no threat.  Moreover, Caraway's deposition testimony on this point is uncontroverted: Caraway was "trying to comply" with directions that were not "the same directions every time," he was afraid that the police were going to shoot him, he was in a hurry, and he just wanted to "toss it to the right of me as quickly as [he] possibly could." J.A. 257 at 57:1-5; *id*. at 58:4-8; *id*. at 59:16-18; *id*. at 61:12-15.

[2] Even after Caraway had raised his hands, the officers confusingly continued to shout "Get your hands up" amidst their other commands.  J.A. 84 (Roberts's BWC) at 2:31–32.

32

required him to put his hand on his firearm in order to "drop it." In construing the facts as demonstrating a threat, the district court and the majority "diminish and outright disregard evidence tending to refute any threat that otherwise might be inferred by [Caraway's conduct]." *Martin v. Short*, No. 23-1588, 2024 WL 3200715, at *3 (4th Cir. June 27, 2024). Thus, the district court, respectfully, failed to construe the facts and inferences drawn from the facts in the light most favorable to Caraway (as required under Rule 56) and I would therefore reverse.

Indeed, the majority finds that Caraway vigorously disputes certain critical facts in his brief and thus claims that these representations, because they are in a brief, should be ignored. I agree that a brief cannot be used as a basis for a factual finding and that perhaps Caraway could have done more to develop the record below, but the district court and the majority again improperly take the inferences in a light most favorable to the officers despite contrary evidence. Take for example, the characterization that Caraway "spun around" "very fast." J.A. 874. This characterization is belied by the surveillance video evidence from the Mercedes Benz dealership – not cited by the majority – which shows: Caraway walking in the opposite direction of the officers' approaching, Caraway turning as he continues walking in response to hearing the officers approach, and Caraway beginning to go to his knees before he is shot. J.A. Vol. III (Mercedes Benz Footage #1) at 2:08-15.[3] Yet, despite this contrary video evidence, the majority and the district court

---

[3] Even if the video surveillance evidence did not belie the officers' characterization, it is again unclear why the inference should be drawn in favor of the officers that there is a negative connotation attached to Caraway "spinning around very fast." It would appear

33

credit the officers' characterization and find that Caraway's brief failed to support his argument. The juxtaposition or conflicts in what are the contested facts and contested inferences from those facts in the case underscore why summary judgment is not the favored way of resolving this dispute at this time.

It is perhaps unsurprising that the district court credited the officers' accounts of the incident for, as the majority recognizes, the district court relied almost exclusively on the internal investigation report. *See Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 573 (W.D.N.C. 2022). The majority characterizes this reliance as "peculiar." Importantly, where the district court relies primarily on an internal investigation report, which had already determined that the officers acted reasonably, how could the district court reach a different result? This reliance appears to have colored the district court's interpretation of the facts and accounts for its failure to take reasonable inferences in favor of Caraway. Specifically, although the district court purports to draw inferences in favor of Caraway, the district court finds that Caraway acted "abruptly" in withdrawing the gun from his pocket and that "a reasonable jury could find the officers were justified in interpreting this sudden act as a threat." *Caraway*, 639 F. Supp. 3d at 572. But this analysis: (i) fails to engage with the facts, which are that the officers *instructed* Caraway to "drop the gun"; (ii) fails to engage with the video evidence, which shows that Caraway did not act suddenly or abruptly; and (iii) turns the summary judgment analysis on its head. Furthermore, in

completely expected that a person walking down the street would "spin around" in surprise when that person hears a number of people suddenly appearing behind them and yelling aggressively.

34

determining that the officers acted reasonably, the district court notes that Caraway was shot "within seven seconds of the first command for Plaintiff to show his hands," and that, "[i]n mere seconds Plaintiff went from being unaware of the officers' presence to pulling his firearm out of his pocket." *Id*. at 573. But again, this ignores that in those "mere seconds" Caraway had to respond to the officers' multiple and conflicting commands instructing Caraway to take different actions, including the instruction to "drop the gun." The instruction to "drop the gun" makes it hardly surprising that Caraway would have to pull the firearm out to "drop it." Rather than take any of the inferences associated with the facts in favor of Caraway or even discuss the conflict that Caraway faced once he was given the instruction to drop the gun that he knew he possessed, the district court instead found that Caraway touching his gun was "abrupt," "sudden," and "threatening" – facts contradicted by the video evidence.

With respect to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," I would also reverse. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Police immunity under §1983 is a necessary and indispensable protection for law enforcement. Police work is inherently dangerous and the reasonableness test under § 1983 gives law enforcement a safe harbor for official actions in their day-to-day policing challenges. However, police immunity under § 1983 is not *carte blanche* to shoot citizens simply by claiming mistake. Reasonableness is the test and a jury – the citizenry itself – is the best arbiter of the dispute here, where there is video and statements by the officers themselves that present a very compelling view of the incident.

35

In this case, the majority acknowledges that Caraway was confronted with conflicting commands directing him to keep his hands up, drop the gun, and get on the ground and that Caraway attempted to quickly comply with those commands. J.A. 84 (Roberts's BWC) at 2:26–2:30; J.A. 85 (Griffin's BWC) at 0:30–0:35 (Caraway exclaiming "I'm sorry, I was just doing what I was told to do. Y'all said 'drop it,' I'm sorry."). Moreover, there is evidence in the record that Caraway did not "bring [the gun] up to shoot." J.A. 599:9–11. Thus, there is a clear dispute of fact about whether Caraway actually presented a threat to the officers and the district court erred in concluding that he did.

This is precisely the situation that this Court addressed in *Franklin*. Here, as in the *Franklin* case, Caraway "complied the only way he could – by taking the firearm out of his jacket to set it on the ground." 64 F.4th at 533. That his compliance "surprised" the officers because the gun was not where the officers expected does not mean that Caraway acted in a threatening manner. *Id.* Indeed, as this Court recognized in *Franklin*, it was the officer's "flawed view" that made "any movement or further handling of the weapon appear noncompliant and threatening." *Id*. Given the closely analogous facts but starkly different results between this case and *Franklin*, the decision that the majority reaches today not only creates the risk of confusion for law enforcement, but also creates confusion and lacks guidance for district courts attempting to determine on which side of the line future cases fall.

The majority attempts to distinguish *Franklin* by noting how slowly Franklin complied with the officer commands and by asserting that Caraway acted too "quickly" or

36

"suddenly" in complying with the commands to "drop the gun." But, in *Franklin*, the officer viewed Franklin's slowness – which the majority here praises – as "recalcitrance," and the *Franklin* plaintiff was not only shot for his slow obedience to drop the gun, but he was unfortunately killed. *Franklin*, 64 F.4th at 533 (discussing officer's argument that Franklin disobeyed clear commands). Thus, in light of the results of *Franklin*, Caraway was in a no-win situation – again a "Hobson's Choice." The majority's decision reflects extraordinary expectations for a civilian encountering police with high-powered weapons drawn on him. The situation that confronted Caraway is this: he must obey the officers' commands, or he might get shot; he must drop the weapon or he might get shot, but he also must be careful about how he pulls the gun out or he might get shot; he must do all this while having guns drawn on him and while being yelled at from multiple different directions; and, if one of these trained law enforcement officers perceives him as obeying the wrong command, obeying too quickly, or obeying too slowly, he might get shot. *See id.* ("Perhaps he was deciding how to drop a gun he was not holding – or maybe he was just frightened by the torrent of shouting and gun-pointing."). Notably, the gun was not in Caraway's hand until he received the instruction from law enforcement to "drop it." The threat that the officers unreasonably perceived from Caraway's apparent unexpectedly quick compliance with their commands to drop the gun is, at a minimum, a dispute that should be presented to a jury.

And, as this Court recently stated, "given the Policemen's liberal firearm use," Caraway was stuck in a no-win situation where the "situation could have," and almost did, "turn[] fatal" as he tried to follow the officers' "inconsistent commands." *Nazario v.*

37

*Gutierrez*, 103 F.4th 213, 232 (4th Cir. 2024).  This case is yet another example of a situation where "one cannot help noticing that the intensity of the situation emanated not from [Caraway], but from the volume and vigor of the officer's commands." *Franklin*, 64 F.4th at 532.  Indeed, Officer French – who saw the cellphone for what it was and who saw that Caraway was not bringing the gun up to shoot – recognized that it was *law enforcement* contributing to the intensity of the encounter.  J.A. 568:18, 20–23 (reporting initially seeing the cellphone); J.A. 572:13-21 (reporting the officer shooting was "super, you know, amped up right now"); J.A. 599:9–11 ("[h]e didn't bring it up to shoot").  Here, again, the body camera footage – not relied upon by the district court – provides important context for the encounter.  The "amped up" officers aggressively shout at Caraway, directing him in conflicting ways, and continuing to shout at him to do certain things even after he has complied.  J.A. 84 (Roberts's BWC) at 2:27–2:38.  Even where the officers saw Caraway drop like "a sack of potatoes" after the first shot and where Caraway was struck four times (including his neck), the officers approached the prone Caraway by yelling at him to "get on the fucking ground!"  J.A. 571:19-25 (reporting that Caraway went down "like a sack of potatoes"); J.A. 84 (Roberts's BWC) at 2:40–2:42 (instructing Caraway to "Get on the fucking ground!").

The cases cited by the majority in support of their finding that the officers acted reasonably are inapposite because, in each of those cases, the plaintiff failed to obey officer commands; whereas, here, the majority concedes that Caraway was obeying officer commands.  In *Slattery*, rather than comply with officer commands to raise his hands, Slattery "turned his entire upper body towards the officer, who could still not see Slattery's

38

left hand," and the officer thought that Slattery was concealing a weapon.  939 F.3d at 215. Here, by contrast, Caraway was obeying officer commands to drop the weapon.  J.A. 84 (Roberts's BWC) at 2:29 (Officer Gladden directing Caraway to "Drop the gun!").  Likewise, in *Elliott v. Leavitt*, the suspect pointed the gun at the officers *despite* being instructed to drop the weapon.  99 F.3d 640, 642-44 (4th Cir. 1996).  But, here, Caraway was obeying commands to drop the weapon, and there is at least a dispute of fact that Caraway did not "bring it up to shoot."  J.A. 599:9–11 (Officer French testifying Caraway "never raised it" and "[h]e didn't bring it up to shoot").  Again, in *Anderson v. Russell*, the suspect disobeyed an officer command to raise his hands.  247 F.3d 125, 130-31 (4th Cir. 2001).  But, here, Caraway was obeying a command to "drop the gun" while the commands given by the officers were inconsistent and it was unclear which one should be obeyed first. *See Franklin*, 64 F.4th at 533 (the officer's commands "were too ambiguous" to transform "hesitation into recalcitrance").  Indeed, in the moment, Caraway was explaining to the officers after they shot him that he was only trying to obey their commands.  J.A. 85 (Griffin's BWC) at 0:30–0:35 ("I'm sorry, I was just doing what I was told to do.  Y'all said 'drop it,' I'm sorry.").  Therefore, it was not objectively reasonable for the officers to shoot Caraway as he was obeying their confusing commands to "drop the gun."

The majority's somewhat limited discussion of the other *Graham* factors is also attenuated.  After determining in the first instance that "Caraway tried to comply by reaching into his jacket pocket," the majority turns an about face without discussion of the facts or analysis of any caselaw and determines instead that "it was objectively reasonable for an officer at the scene to believe that Caraway was attempting to resist arrest by pulling

39

his gun to threaten them." This conclusion is, in my view, unsupported by the record or the video in this case, which shows that, Caraway attempted to comply with officer commands at every step: he raises his hands as instructed, he is in the process of going to the ground as instructed, and he attempts to drop the gun as instructed. J.A. 84 (Roberts's BWC) at 2:27–2:38. Indeed, Officer French notes that Caraway "almost immediately" put his hands up when confronted by the officers and that Caraway "never raised" the gun and "didn't bring it up to shoot." J.A. 568:18; *id*. at 599:9–11. Where a civilian (or a suspect) is obeying officer commands, it cannot be reasonable for the officers to view that obedience as a threat. For all of these reasons, I would reverse the district court's finding of qualified immunity on the excessive force claim, and I respectfully dissent here.

I also dissent with respect to one other issue raised on appeal regarding whether the district court erred by failing to analyze the reasonableness of the shots fired at the beginning of the encounter separately from the those fired after Caraway had fallen to the ground. This Court has recognized that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). This Court has also held that an officer may not use force against an incapacitated person "unable to get up or otherwise defend himself," even if the person is armed. *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 669-70 (4th Cir. 2020) (quoting *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011)).

Here, the evidence is that Caraway fell face-first onto the sidewalk one second after the first shot was fired. J.A. 84 (Roberts's BWC) at 2:36–2:38. The officers recognized

40

this, but the shots still continued. Officer Roberts testified that Caraway "[went] down" after the first shot. J.A. 542:3–4. Officer French explained that, as soon as the shots started, Caraway "went like a sack of potatoes to the ground" and that the gun "c[a]me right out of his hand when he went to the ground." J.A. 571:19–25. Nonetheless, the shots continued. J.A. 572:10-11. Officer French was not only able to recognize that the gun was out of Caraway's hands while the shots were continuing – he had time to reflect on the optics and that whoever was shooting "is super, you know, amped up right now." J.A. 572:13-21 ("You know, like I'm thinking about the optics, I'm thinking there's probably a lot of people watching. I know whoever just fired . . . I thought whoever just fired is super, you know, amped up right now."). Officer Gladden also testified that the gun was "moving . . . out of [Caraway's] hand" as he was "falling" and "went face-first." J.A. 669:3-5; J.A. 670:17-21. The majority discounts this distinction and the fact that there was clearly time for reflection with the conclusion that, "given that the entire sequence of shots lasted only three or four seconds, we decline to extend *Waterman* to these facts." But this ignores that the officers *in the moment* were able to draw the distinction that the shots continued even after Caraway was incapacitated and that it would be "bad optics" for them. As for the "bad optics" of the subsequent shots, I suggest that these circumstances should have been part of the analysis by the majority.

In the end, the majority and the district court fail to give Caraway the inferences to which he is entitled, fail to explain what Caraway could have done to avoid being shot, and fail to explain how future cases should distinguish between the facts of this case and the facts of *Franklin*. I am left with some of the very same questions that Caraway can be

41

heard to plaintively ask on the body camera footage: Caraway was just doing what the officers told him to do; why did they shoot him?[4]  And, I fear that this situation is doomed to repeat itself where officers are chasing a tenuous description of a black man with a gun and approach with an intensity that "amps up" the officers but scares and confuses the individual, who in all likelihood has heard too many stories of people like himself being shot by law enforcement.  Unfortunately, Officer French's very poignant suggestion of "bad optics" permeates this entire case.

I respectfully dissent.

---

[4] J.A. 85 (Griffin's BWC) at 0:30–0:35 (Caraway crying out "I'm sorry, I was just doing what I was told to do.  Y'all said 'drop it,' I'm sorry."); J.A. 84 (Roberts's BWC) at 2:32-33 ("I went on the ground, why did y'all shoot me?").